UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                              :

MICHAEL DEBIASE,                     :

                                               :                     MEMORANDUM
                      Plaintiff,           :                     AND ORDER
        - against -                :

                                                 :

CAT ISLAND SHIPPING, LTD., and      :           07-CV-3057 (JG) (MDG)
TRIREME VESSEL MANAGEMENT,      :

                                               :

                      Defendants.      :
------------------------------------------------------------- X

A P P E A R A N C E S:

       THE LAW OFFICES OF LAWRENCE P. BIONDI
             81 Main Street, Suite 504
             White Plains, NY 10601
       By:    Lawrence P. Biondi, Esq.
             Richard Mandel
             Attorneys for Plaintiff

       WAESCHE, SHEINBAUM & O'REGAN, P.C.
             111 Broadway, 4th Floor
             New York, NY 10006
       By:    John R. Keough, III
             Peter Caro Dee
             Attorneys for Defendants

JOHN GLEESON, United States District Judge:

       Michael DeBiase brings this negligence action pursuant to the Longshore and

Harbor Workers' Compensation Act ("LHWCA") as amended in 1972, 33 U.S.C. § 905(b),

seeking damages for crush injuries he sustained to his hand while working as a longshoreman on

the M/V Barrington Island ("the Vessel"). The defendant ship owner, Cat Island Shipping, Ltd.,

and the technical ship manager, Trireme Vessel Management (collective "defendants") move for

summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons

set forth below, the motion is granted.

BACKGROUND

For the purposes of the instant motion, I accept undisputed facts as true and resolve disputed facts in favor of the plaintiff where there is evidence to support his allegations.

On April 12, 2005, at approximately 1:00 in the afternoon, the Vessel was docked at New York Container Terminal ("NYCT") in Staten Island, New York. NYCT was employed to perform stevedoring operations for the Vessel, her owner and operators. Those operations included loading and unloading the Vessel and tying the ship up. At that time, DeBiase, who had been employed by NYCT as a longshoreman for almost five years, was assigned to load cargo containers onto the Vessel. He worked as part of a longshore gang of approximately 10 men, led by Joe Mangiacapre, the hatch boss, who had over 30 years of experience as a longshoreman. DeBiase was the fourth most senior member of the gang. Another NYCT longshoreman, Louis Spitalieri, who was not a member of Mangiacapre's gang, was filling in that day as a crane operator for the gang and was operating crane number nine. The area where the gang was working had been turned over by defendants to the stevedore contractor for the purpose of loading the Vessel.

The process of loading containers onto the Vessel entails the crane lifting the container off of the chassis and lowering it onto the deck. The longshoremen on the deck direct the crane operator via radio where to place the container. The objective is to place the container onto twist locks or shoes that have been placed onto the deck fittings. A twist lock or "shoe" is a mechanism placed at the four corners of a shipping container, which secures the containers in place (either to the deck via fittings, to the hold, or to each other) to prevent them from shifting during transit. On Island class ships like the Barrington Island, the twist locks need to be manually locked.

2

On the Vessel, as on other Island class ships, when a container is lowered onto the deck, the twist locks are commonly knocked out of place. Longshoremen must then manually reposition the displaced twist locks. Typically, when a twist lock is displaced a longshoreman contacts the crane operator via radio to instruct him to pick up the container so that he can safely reposition the twist lock. The crane operator then lifts the container[1] and the longshoreman on deck repositions the shoe. When he is finished, the longshoreman radios to the crane operator again to tell him that he may lower the container, or walks out into view of the crane operator to signal that he is out of the way so that the container may be safely lowered.

On April 12, 2005, DeBiase's responsibilities included the placement of twist locks. While DeBiase was attempting to reposition and secure a displaced twist lock in Bay #2 on the starboard side of the Vessel, his left hand was crushed by a container that was being loaded onto the Vessel.

Accounts of the events leading up to the injury differ.

Spitalieri testified that at the end of his lunch break on April 12, 2005, he was instructed to go to his crane to lift a container that had been improperly put down so that a shoe that had been displaced during loading prior to lunch could be repositioned. Spitalieri Dep. at 52-3.[2] Spitalieri lifted the container until he received a radio instruction to "hold it." *Id*. at 61, 71. He could not recall who instructed him to hold it. *Id*. at 62. He estimated that he lifted the container six to eight inches,[3] but since he could not see the area from his vantage point (over a

_____

[1]      If the displaced shoe is underneath the container, the crane operator must move the container up and "out of position" so that the longshoreman can safely walk underneath it. Mangiacapre Dep. at 107-08. In a scenario similar to the one that occurred on April 12, 2005, the container would need to be lifted about three feet. *Id*. at 113-14.

[2]      Though deposition excerpts were provided as exhibits to the parties' submissions, I ordered the defendants to produce complete copies of the depositions of DeBiase, Mangiacapre and Spitalieri and cite to them herein.

[3]      Spitalieri noted that if the container is lifted more than 6-8 inches, injuries like DeBiase's could be avoided. Spitalieri Dep. at 81

hundred feet above the deck) he was not certain of the distance the container was lifted. *Id*. at 62, 70, 73. Spitalieri also was not certain whether multiple attempts to reposition the shoe were necessary or if he only needed to lift it once. *Id*. at 97-98 ("I might have done that and then lift up again and then the shoe had to be reset again. I don't remember. I don't recall that. It might have been a possibility. I don't remember. … It's possible, but I'm almost pretty sure that I just picked it up and held it until they told me to -- you know, 'hold it,' they told me. I lift it up, and they said hold it, hold it like that, that's what I did."). Spitalieri testified that he never lowered the box. *Id*. at 94. While he was holding it in place, suspended above the deck, DeBiase came into view bleeding. *Id*. Referring to the ship "bouncing" in the water, he opined, "the way this injury had happened, he put his hand there when the ship [wa]s moving and the shoe probably wedged into his hand. That's the only thing I could think of." *Id*. He indicated that had he lowered the box, DeBiase would have lost his hand completely. *Id*. at 95. He noted that he did not have to lift the container to release DeBiase's hand. *Id*. at 100.

Mangiacapre, the hatch boss, stated that after lunch he boarded the Vessel to inspect the container that was not properly in place. He noted that the container was resting on the deck, not suspended, and that a few of the twist locks were displaced. Mangiacapre Dep. at 126-27. Though he wasn't certain of it, Mangiacapre thought that he was able to adjust the displaced twist locks on his side of the container with his feet because the fittings were flush with the deck. *Id*. at 125. DeBiase was responsible for a different displaced lock, which was on a pedestal. Mangiacapre noted that it could take two hands to reposition that lock, depending on how loose, rusty or greasy the lock was. *Id*. at 129-30, 133. Mangiacapre indicated that the container needed to be lifted "about three times", *id*. at 142, and that he could not recall whether he or DeBiase gave the instructions to lift it. *Id*. at 88. Though the container was lifted out of

position the first two times, Mangiacapre's end of the container did not move during the third attempt to lift the container because it was properly in place. *Id*. at 144. Mangiacapre said he couldn't have signaled Spitalieri via radio that day because he did not have a radio on him. *Id*. 89, 143. Mangiacapre could not see DeBiase when he knelt down to reposition the twist lock because he was at the other end of the container about 40 feet away from DeBiase. Thus, he could not see DeBiase when the accident occurred. *Id*. at 83, 143. Mangiacapre testified to DeBiase struggling with repositioning the shoe prior to the accident. *Id*. at 100. He noted that lifting the container 6-8 inches would not be enough to safely reposition the lock, but that it should have been lifted at least three feet, though the safest course of action would be to take the container off completely. *Id*. at 137-38.

DeBiase's version of events is as follows: After checking in for his 1:00 p.m. shift, DeBiase walked to the dock to work on crane nine. From the dock he noticed that there was a space open on the ship for a container and a container on a chassis waiting to be loaded. DeBiase Dep. at 134-36. Spitalieri lifted the container, moved it over to the ship and as he placed it down, all four shoes "blasted" out. *Id*. at 136-37. DeBiase said he did not see the shoes blast out; rather, Spitalieri told the gang via radio what had occurred and asked for gang members to go on deck to reposition the shoes. *Id*. at 141. DeBiase boarded the Vessel with Mangiacapre. After successfully repositioning one shoe, he attempted to reposition another when his hand was injured. DeBiase does not believe that Spitalieri dropped the container onto his hand. Rather, he explained that: "The ship was listing on the right side where I was. I had my hand on the shoe, to reposition it. And through, which I know, the lines weren't secure with the listing, it pushed the shoe up through my hand. And coming out -- it went into the palm and came out on the top of my hand. It pushed the shoe and my hand into the corner casting of the

container." *Id*. at 119-20. DeBiase did not communicate with Spitalieri via radio while he was on the deck of the Vessel to raise or lower the container. *Id*. at 158. When asked, DeBiase testified that it was not customary for a longshoreman to tell the crane operator how high to lift the container. *Id*. at 97. DeBiase also stated that the vessel would list when containers were placed onto the Vessel. *Id*. at 97-99.

On June 27, 2007, DeBiase filed this action.[4] DeBiase alleges that the injuries he sustained were the result of defendants' negligent failure to discharge the duties imposed upon them by the LHWCA. Oral argument on the instant motion was held before me on September 25, 2009.

## DISCUSSION

A.      *The Summary Judgment Standard of Review*

Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also e.g.*, *O'Hara v. Weeks Marine, Inc.*, 294 F.3d 55, 61 (2d Cir. 2002). The moving party must demonstrate that no genuine issue exists as to any material fact. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir. 1994). A fact is "material" within the meaning of Rule 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether an issue is genuine, "[t]he

---

[4]      On October 25, 2005, DeBiase filed a complaint against NYCT and NYC Auto Terminal Corp., under The Jones Act, 46 U.S.C. § 688, for damages arising out of the April 12, 2005 incident. *See DeBiase v. NYCT*, No. 05-cv-3488 (SLT). In that action, DeBiase alleged that his injuries were caused "solely by the negligence" of NYCT and NYC Auto Terminal Corp. That case was dismissed pursuant to a stipulation on May 24, 2006.

inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam); *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989)). Therefore, although a court "should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). However, the party opposing summary judgment "may not rest upon the mere allegations or denials in its own pleading; rather, its response must … set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e).

Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis original). The nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. *Matsushita*, 475 U.S. at 586. Nor will "conclusory statements, conjecture, or speculation" by the non-moving party defeat the motion. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996). Summary judgment is proper when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo*, 22 F.3d at 1223-24 (citations omitted).

B.      *The Longshore and Harbor Workers' Compensation Act*

"The shipowner, longshoreman and stevedore form a tripartite legal triangle that is governed by the [LHWCA]." *Conenna v. Loyal Chartering Corp.*, No. CV-98-7402, 2003 WL 255947, at *4 (E.D.N.Y. Feb. 3, 2003). Prior to 1972, under the terms of the LHWCA

employees of stevedores "not only … were entitled to compensation benefits [under the LHWCA], they [also] could recover from vessel owners under the doctrine of unseaworthiness." I Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 5-8 at 190 (2d ed. 1994). Because unseaworthiness is "a species of liability without fault," *id.*, the fact that an employee of a stevedore could bring suit against the vessel owner under that doctrine meant that the employee "might be injured as a result of an unseaworthy condition caused wholly by the stevedore's negligence, and yet the shipowner, wholly without fault, could be held liable for the entire amount of compensatory damages," *Fairmont Shipping Corp. v. Chevron Int'l Oil Co.*, 511 F.2d 1252, 1255 (2d Cir.), *cert. denied*, 423 U.S. 838 (1975).

In 1972, Congress made significant changes to the LHWCA. Its amendments, "provide that shipowners can be held liable to longshoremen only for negligence, and not for unseaworthiness." *Id.* at 1258 n.8. With the passage of the 1972 amendments, "Congress intended to make the vessel answerable for its own negligence and to terminate its automatic, faultless responsibility for conditions caused by the negligence or other defaults of the stevedore." *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 168 (1981).

As modified, the LHWCA "operates as a comprehensive no-fault workers' compensation scheme for eligible harbor workers." *Sinagra v. Atlantic Ocean Shipping, Ltd.*, 182 F. Supp. 2d 294, 299 (E.D.N.Y. 2001). The statute "entitles employees to no-fault compensation payments for work-related injuries" and, "[a]s with most other workers' compensation schemes, this entitlement displaces the employee's common-law right to bring an action in tort against his or her employer." *O'Hara*, 294 F.3d at 62. Injured employees may, however, bring suit against negligent third parties. *Id.*; *see* 33 U.S.C. § 933(a) ("If … the person entitled to … compensation determines that some person other than the employer … is liable in

damages, he need not elect whether to receive such compensation or to recover damages against such third person.").  Specifically, § 905(b) allows a longshore worker providing stevedoring services to a vessel to recover from that vessel for any injuries he sustains as a result of the vessel's negligence without forgoing statutory compensation if he follows certain procedures. *Id*. at § 905(b)[5]; *see Estate of Cowart v. Nicklos Drilling Co*., 505 U.S. 469 (1992).  "The design of these changes was to shift more of the responsibility for compensating injured longshoremen to the party best able to prevent injuries: the stevedore-employer."  *Howlett v. Birkdale Shipping Co., S.A*., 512 U.S. 92, 97 (1994).  Thus, the Court held that vessels should not be liable for damages "for injuries that could be … anticipated and prevented by the competent stevedore."  *Id.*  This principle, which animated the policy shift in the statute, continues to inform judicial decisions interpreting the scope of the duties for which a third party may be held liable.

Congress did not define what conduct or omissions may be deemed negligent; it left "the determination of shipowner negligence to the 'application of accepted principles of tort law and the ordinary process of litigation.'"  *Flynn v. American Auto Carriers, Inc*., 85 F. Supp. 2d 158, 163 (E.D.N.Y. 2000) (quoting *Scindia*, 451 U.S. at 165).  In the years since the amendments, the Supreme Court has provided guidance with respect to a shipowner's duties to longshoremen.  *Scindia*, 451 U.S. 156; *Howlett*, 512 U.S. 92.  As outlined by the Supreme Court in *Scindia* and refined by *Howlett*, a vessel owner owes three different duties to longshore workers performing cargo operations on its vessel: (1) the "turnover duty," which "relates to the condition of the ship upon the commencement of stevedoring operations"; (2) the "active

---

[5]     Section 905(b) provides in relevant part:
In the event of injury to a person covered under this Act caused by the negligence of a vessel, then such person … may bring an action against such vessel as a third party …, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void….  The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred.

33 U.S.C. § 905(b).

control" duty, which is applicable once stevedoring operations have begun and provides that a shipowner "must exercise reasonable care to prevent injuries to longshoremen in areas that remain under 'active control of the vessel'"; and (3) the "duty to intervene," which pertains to the vessel's obligations with respect to "cargo operations in areas under the principal control of the independent stevedore." *Howlett*, 512 U.S. at 98 (citing *Scindia*, 451 U.S. at 167).[6] Each duty will be discussed below in the context of DeBiase's claims.

C.      *Defendants' Motion for Summary Judgment*

1.      *The Vessel's Turnover Duty*

A shipowner's "turnover duty" comprises both a primary duty to provide safe conditions and a corollary duty to warn of known, non-obvious hazards. The primary duty mandates that prior to turning over the ship or any portion of it to the stevedore, "the vessel owner must exercise 'ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety.'" *Gravatt v. City of New York*, 226 F.3d 108, 120-21 (2d Cir. 2000) (quoting *Scindia*, 451 U.S. at 167). The corollary duty requires the vessel owner to "warn the stevedore of hidden dangers that could not be discovered through the exercise of reasonable care." *Id.* Though a vessel's duty encompasses providing the stevedore with a safe work area free from "unreasonable hazards[,] …[t]here is no duty to turn over an absolutely safe vessel." *Sinagra*, 182 F. Supp. 2d at 300.

DeBiase argues that defendants breached their primary turnover duty to provide safe conditions by failing to inspect and properly maintain the vessel and by "permitting and maintaining a rusty and defective twist-lock shoe and foundation fitting." Pl.'s Br. at 4. He

---

[6]      The legal vernacular has come to term these duties as the "*Scindia* duties." *See, e.g.*, *O'Hara,* 294 F.3d at 64-65.

contends that the twist lock was dangerous both because of its rusty condition and because of its "long outmoded" design. *Id*.

> The Supreme Court has circumscribed the scope of the primary turnover duty:
>
> A vessel must "exercise ordinary care under the circumstances" to turn over the ship and its equipment and appliances "in such condition that an expert and experienced stevedoring contractor, *mindful of the dangers he should reasonably expect to encounter*, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care" to carry on cargo operations "with reasonable safety to person and property."

*Howlett*, 512 U.S. at 98 (quoting *Federal Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 416-17, n.18 (1969)) (emphasis added).

As an initial matter, there is nothing in the record to suggest that -- aside from the rust -- there was anything defective about the twist lock DeBiase was trying to reposition on April 12, 2005. In addition, the record lacks any evidence that it was unreasonable to expect that DeBiase himself would understand that rusty twist locks would be encountered in the performance of his duties and that the rusty twist locks do not prevent a stevedore from safely carrying out the cargo operations for which DeBiase was responsible. Assuming, *arguendo*, that a reasonable juror could find that a rusted twist lock constitutes a hazard, DeBiase must nonetheless introduce evidence that an expert and experienced stevedore would not "be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property." *Scindia*, 451 U.S. at 167. "Indeed, the very fact that the discharging of cargo is carried out by expert and experienced stevedore[s] implies that certain dangers that may be hazardous to unskilled persons need not be remedied if an expert and experienced stevedore could safely work around them." *Sinagra*, 182 F. Supp. 2d at 302 (internal quotation marks omitted); *see also Bjaranson v. Botelho Shipping Corp., Manila*, 873 F.2d 1204, 1207-08 (9th Cir. 1989) ("With respect to the turnover duty of safe condition, the Supreme Court in *Scindia*

did not state unequivocally that the ship and its equipment must be in a safe condition. Rather, in preparing the ship for a cargo operation, the vessel must exercise ordinary care in light of the fact that the operation will be conducted by an 'expert and experienced' stevedore.").

The uncontroverted evidence in the record supports the conclusion that an expert and experienced stevedore could have safely conducted the cargo operation despite the rusted twist lock. DeBiase testified that he and his gang were familiar with the Vessel and had worked with its equipment, including displaced twistlocks, numerous times before. DeBiase Dep. at 45-46, 78-79 (DeBiase had worked on Island class vessels on a weekly basis from October 2000 through April 2005); *id.* at 111-12 (On April 12, prior to boarding the Vessel, DeBiase and his fellow longshoreman were remarking to each other "[H]ere we go again. The first container of the day blasted the shoes out of place…. [It was a]lways the same problem. Everybody I know don't like working on those ships."). Mangiacapre testified that he had loaded the Island ships, including the Vessel, "many times." Mangiacapre Dep. at 92; *id*. at 138 (noting that it was "pretty common" for the shoes to get "knocked out" on Island vessels). Defense expert Walter Curran notes:

> The fact that a fitting and/or twistlock may be rusty does not make it dangerous. Rust on a fitting and/or twistlock may make it a little more difficult to slide in position or turn but that is inherent in this type of operation, is an open and obvious condition and is easily dealt with by an experienced and safety minded longshoreman.

Keough Decl., Ex. H at 8. Another defense expert, Gerard P.D. Coleridge, stated: "The fact that a container fitting or twist lock is rusty does not make it dangerous. Although rust may make it more difficult to set the twist lock, this is a condition easily dealt with by a safety conscious longshoreman." *Id.*, Ex. I at 1. Defense expert Jacek Talandzis's report indicates: "Rusty cargo securing equipment is a common occurrence in ocean going vessels and does not pose a danger

to a trained safety conscious stevedore." *Id.*, Ex. J at 2. In this regard, DeBiase's expert, Terry

Upson, agreed with defense experts, noting only that "if rusted, [the twist locks are] difficult to

reposition by hand." Mandel Decl., Ex. 1 at 3. The record lacks any evidence that the rust on a

twist lock would prevent an expert and experienced stevedore from safely performing his duties.

Thus, under the circumstances, DeBiase's claim that defendants were negligent for maintaining a

rusty twist lock cannot give rise to a breach of the turnover duty.

DeBiase also alleges that defendants were negligent because the

"design/configuration" of the twist lock shoe and foundation fitting was "dangerous, long

outmoded, and should have been replaced." Pl.'s Br. at 4-5.[7] But, "[a] claim for negligent

design is merely another way of alleging that the Vessel was unseaworthy, a cause of action that

Plaintiff cannot assert because, … he is covered by the LHWCA." *Anastasiou v. M/T World

Trust*, 338 F. Supp. 2d 406, 418 (E.D.N.Y. 2004) (allegations that vessel ramp was defectively

designed did not assert negligence claim permitted under LHWCA, but rather challenged

seaworthiness of vessel). Thus, to the extent that DeBiase is basing his negligence action on

design defects of the twist lock or foundation fitting, his claim is flawed. *See Bilderbeck v.

World Wide Shipping Agency*, 776 F.2d 817, 819 (9th Cir. 1985) (to defend against a summary

judgment motion, an injured longshoreman must specifically identify negligent conduct;

otherwise it is "simply another attempt to get seaworthiness into the case in the face of a clear

---

[7]     The parties dispute whether the design of the twist-lock rendered them dangerous. Defense expert
Curran states:

> The container fittings and twistlocks were not improper. I have seen for many years and continue
> to see fittings and twistlocks of this type in use on vessels and they are perfectly adequate for the
> purpose. The fittings and twistlocks are not dangerous. They pose no inherent hazard to the user,
> any more than the placement of any other type of container fitting or twistlock.

Keough Decl., Ex. H at 8. Defendants' expert Coleridge notes that the "foundations are no more or less dangerous
than any other type of fitting." *Id.*, Ex. I at 1. Defense expert Talandzis's report states: "I am familiar with dovetail
fittings and single cone twist lock configurations and believe that they are acceptable for use of securing cargo
container …. These container fittings and twist locks are not dangerous or improper if handled safely by a
stevedore." *Id.*, Ex. J at 1. On the other hand, plaintiff's expert disagrees, stating that the container fittings are
"inadequate and unsafe, as they can secure a container shoe (a twist lock) only in three directions." Mandel Decl.,
Ex. 1 at 1. However, for the reasons stated in the text this claim fails as a matter of law.

Congressional intent to remove it"); *see also McSwiggan v. Oulu Shipping Ltd.*, No. 90-7001, 1992 WL 70416, at * 3 (E.D. Pa. Mar. 31, 1992) (claim that existence of a recessed ladder was a design defect rendering the ship unseaworthy is not available under the LHWCA), *aff'd*, 980 F.2d 723 (3d Cir. 1992); *Matthews v. Lykes Bros. S.S. Co., Inc.*, No. 83-6699, 1987 WL 16506, at * 17 (C.D. Cal. Feb. 26, 1987) (granting judgment as a matter of law against party alleging that ramps on a vessel were not designed properly where there was no evidence that the vessel owner "negligently created or modified the ramps"), *aff'd*, 854 F.2d 1166 (9th Cir. 1988); *Salvato v. Hakko Maritime Corp.*, 718 F. Supp. 1443, 1445-46 (N.D. Cal. 1989) (allegations that defendant negligently placed lashing padeyes on car carrier amounted to a design defect not recognized by the LHWCA).

DeBiase also alleges that the defendants were negligent for failing to replace the older equipment with newer twist locks and foundations. His repeated assertions that the Vessel's equipment was improper because it was of an older design is flawed. Defendants have no duty to provide the most modern equipment available. Like the design defects claim, in essence this claim improperly challenges the seaworthiness of the Vessel. Moreover, the Vessel and its twist locks and foundation fittings meet the requisite specifications and rules of the Vessel's classification society, Lloyd's Register of Shipping, which has certified its approval of the devices. Keough Decl., Ex. K. Plaintiff's expert's opinion that the equipment should have been replaced does not create an issue of fact for a jury because as a matter of law defendants owed no duty to modernize. Though the Vessel owed a duty to replace any defective, *i.e.*, non-functioning, equipment, there is no evidence (including the fact that the equipment was ultimately replaced in 2008) to suggest that the condition of the equipment in 2005 warranted its replacement based on its condition.

To the extent that DeBiase is alleging that defendants breached the corollary duty to warn, his claim fails because the rusted condition and design (whether defective or not) of the twist lock were obvious to him. As noted above, the duty to warn "attaches only to latent hazards … that would be neither obvious to nor anticipated by a competent stevedore in the ordinary course of cargo operations." *Howlett*, 512 U.S. at 99 (addressing the scope of ship owner's duty to warn of latent hazards in the cargo stow area where a longshoreman slipped on clear plastic, which was not visible to him, that had been improperly placed under the cargo); *see also Keller v. United States*, 38 F.3d 16 (1st Cir. 1994) (duty to warn exists only if "defect" "would not be obvious to or anticipated by [stevedore] if reasonably competent in the performance of his work"). This is because the "primary burden … for avoiding injuries caused by obvious hazards" is placed on the stevedore, who is in the best position to avoid obvious harms. *Scindia*, 451 U.S. at 180 (Powell, J., concurring).

Whether a particular condition is open and obvious is often a question of fact, *see Kirsch v. Plovidba*, 971 F.2d 1026, 1030 n.5 (3d Cir. 1992), but on the record before me no reasonable finder of fact would fail to determine that the hazard posed by a rusty twist lock is obvious to a competent stevedore experienced with loading operations. *See Sinagra*, 182 F. Supp. 2d at 301 (no issue of fact as to obviousness of condition where longshoreman admitted to seeing the condition -- a twist lock attached to a container -- prior to the accident). DeBiase does not dispute that the rusted condition of the twist lock was visibly apparent to him. Indeed, there is no dispute that rusted deck fittings and twist locks on a shipping vessel are conditions that are reasonably anticipated by competent stevedores. For example, defense expert Talandzis's report indicates: "Rusty cargo securing equipment is a common occurrence in ocean going vessels…." Keough Decl., Ex. J at 2. Similarly, the design of the equipment was "open and obvious" to

DeBiase who was familiar with the Vessel and its cargo loading devices.  *See* DeBiase Dep. at

45, 78-79 (stating that he worked on Island class vessels on a weekly basis starting in October

2000 to April 2005 when he was injured); Mangiacapre Dep. at 72 (noting that his gang was

familiar with the Vessel and had worked it before); *id*. at 98 (stating that both he and DeBiase

had experience repositioning displaced shoes on the Vessel and similar Island ships).

Finally, DeBiase makes an argument similar to the one rejected by the Supreme

Court in *Howlett*: that the defendants breached their turnover duty to warn by failing to inspect or

to discover the existence of a hazard.  *See Howlett*, 512 U.S. at 100-103 (vessel has no duty to

make reasonable inspections during or after stevedoring operations to discover defects in the

stow); *see also Derr v. Kawasaki Kisen K.K*., 835 F.2d 490, 493 (3d Cir. 1987) ("*Scindia*

compels the holding that the shipowner has no duty to supervise or inspect cargo loaded or

unloaded by stevedores and therefore may not be held liable for injuries arising out the

stevedore's failure to perform his job properly.") (footnote omitted).  Insofar as this is a claim

that defendants had an ongoing duty to inspect during cargo loading operations, the argument is

addressed below in the context of the duty to intervene.  To the extent that DeBiase claims that

defendants owed him a duty to inspect prior to loading operations, that duty is encompassed in

the turnover duty as discussed above, which requires only that a vessel turn over a ship and its

equipment in safe condition and to warn of latent, non-obvious hazards.

In sum, for the foregoing reasons, plaintiff has failed to demonstrate the existence

of any genuine issue of material fact with respect to defendants' turnover duty.

2. *Active Control Duty*

Once the stevedore's operations have begun, a vessel may be held liable "if it

actively involves itself in the cargo operations and negligently injures a longshoreman," or

negligently injures a longshoreman in an area that remains in its active control. *Scindia*, 451 U.S. at 167. Expounding on the second scenario, the Second Circuit has explained:

> A passive vessel owner has no ongoing duty to supervise or inspect the stevedore's work--absent contractual, regulatory or customary obligations to the contrary. However, even where the vessel does not actively involve itself in the stevedoring operations, it may be liable "if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." Therefore, the vessel must take care to prevent unreasonable hazards in areas of the vessel under its direct control.

*Gravatt*, 226 F.3d at 121 (quoting *Scindia*, 451 U.S. at 167) (internal citations omitted). Liability is not triggered by active involvement alone, but by active involvement that is negligent.

The evidence viewed in the light most favorable to DeBiase requires the conclusion that the defendants did not breach their active control duty. DeBiase has not shown that the crew negligently and actively involved itself in the loading of the cargo or exposed him to a hazard stemming from the ship's equipment under the defendants' control.

As noted by the Second Circuit, absent contractual obligations to the contrary, a vessel owner has no ongoing duty to supervise the stevedore. *See Gravatt*, 226 F.3d at 121. The contract between the Vessel and NYCT did not require the Vessel to accept responsibility for loading the cargo. Instead, that responsibility lay solely with NYCT. Keough Decl., Ex. C (Section XI. Safety), at ¶ 2. DeBiase has not alleged that the defendants were in active control of any operations, areas or equipment involved in the accident. NYCT employees performed and controlled the loading operation, a stevedore-owned and operated crane loaded the containers and a stevedore gang provided the man power.

No genuine issues of material fact exist with respect to whether the defendants were actively involved in the loading operation, let alone that such involvement was negligent. Accordingly, DeBiase's claims based on this theory fail.

3.      *Duty to Intervene*

Despite the general rule that a vessel owner has no duty to warn longshoremen of obvious defects and may rely on their expertise in the performance of their duties, the third *Scindia* duty imposes upon a vessel the duty to intervene "if it acquires actual knowledge that (1) a condition of the vessel or its equipment poses an unreasonable risk of harm and (2) the stevedore is not exercising reasonable care to protect its employees from that risk." *Gravatt*, 226 F.3d at 121 (citing *Scindia*, 451 U.S. at 175-76). Thus, even where a dangerous condition or hazard is open and obvious, an informed ship owner has a duty to intervene if the stevedore's judgment was "obviously improvident." *Scindia*, 451 U.S. at 175. This duty applies to "obvious dangers in areas under the principal control of the stevedore." *Gravatt*, 226 F.3d at 121. *See also Lieggi v. Maritime Co. of Philippines*, 667 F.2d 324, 328 (2d Cir. 1981) (the Second Circuit has "formulated a more general principle, applicable not only to the ship's gear but also to transitory conditions on the ship," that "if the shipowner knows of the dangerous condition and should anticipate that, even if the condition is obvious, the stevedore will not or cannot correct it and the longshoremen will not or cannot avoid it, the shipowner has a duty to take reasonable steps to eliminate or correct the condition").

The duty to intervene was at the heart of *Scindia*. Finding that "there are circumstances in which the shipowner has a duty to act where the danger to longshoremen arises from the malfunctioning of the ship's gear being used in the cargo operations," *Scindia*, 451 U.S. at 175, the Court reversed a grant of summary judgment and ruled that a question of fact existed with respect to whether the ship should have realized that a malfunctioning winch created an unreasonable risk of harm. In *Scindia*, it was apparent to those working with the winch during the two days prior to the accident that it had been malfunctioning. *Id.* The Court noted that

whether the winch could be used safely was within the stevedore's discretion in the first instance. However, it found that it was "quite possible" that the stevedore's judgment was "so obviously improvident" that the shipowner, "if it knew of the defect and that [the stevedore] was continuing to use it," should have realized that the winch presented "an unreasonable risk of harm to the longshoremen," triggering a duty intervene and repair the ship's winch. *Scindia*, 451 U.S. at 175-76.

Thus, applying *Scindia* to the facts of this case, the crucial question is this: "If [the shipowner] was aware that the [twist lock] was malfunctioning to some degree, and if there was a jury issue as to whether it was so unsafe that the stevedore should have ceased using it, could the jury have also found that the [twist lock] was so clearly unsafe that [the shipowner] should have intervened and stopped the loading operation…?" *Scindia*, 451 U.S. at 178.

First, there is no evidence that the defendants were aware that the twist lock was malfunctioning. Unlike the facts in *Scindia*, there is no record here that problems or defects pertaining to any of the twist locks or container fittings were documented by or with NYCT personnel prior to the accident.[8] *See* Keough Decl., Ex. H at 6. In fact, DeBiase does not allege that the rusty twist lock was malfunctioning. He contends only that the mere fact that it was rusty rendered it more difficult to use and therefore, hazardous, a contention I reject for the reasons stated above. Even assuming *arguendo* that defendants knew that the twist lock was rusty and that questions of fact remain regarding whether it was so unsafe that NYCT should

---

[8] DeBiase alleges that the defendants were negligent for failing to intervene when he placed his hand under the suspended container or acted in dangerous manner. Def.'s Br. at 15. This claim fails. There is no evidence that anyone, including Mangiacapre or Spitalieri, saw DeBiase in the moments prior to the accident, and thus could have intervened. DeBiase's argument misapprehends the scope of the duty to intervene, which only arises when a stevedore is not taking reasonable care to protect its employees from a hazardous condition on the vessel *of which the shipowner is aware*. The duty to intervene in no way imparts on defendants an obligation to supervise the stevedore gang after the ship has been turned over to them and to regulate its conduct.

have avoided using that particular twist lock,[9] nothing in the evidence would allow a reasonable jury to conclude by a preponderance of the evidence that it was so "obviously improvident" for NYCT to continue the loading operation such that the defendants should have intervened. To the contrary, the evidence shows that repositioning twist locks was a common occurrence, DeBiase and his gang had experience with the Vessel and its equipment, and rust was to be anticipated. *See* DeBiase Dep. at 105 ("With the shoes being in the condition that they are, everyone didn't really like to work on that ship, the shoes being rusty, they are not lubricated. Everybody knows that. They don't work. They pop out of place constantly."); *id.* at 87-88, 94 (noting that it was a common practice for shoes to get knocked out of place when a container was being lowered onto the deck of the Vessel and for the longshoremen to reposition displaced shoes). In addition, defense expert Talandzis's expert report stated: "Rusty cargo securing equipment is a common occurrence in ocean going vessels and does not pose a danger to a trained safety conscious stevedore. Rust alone on a deck fitting or twist lock is not a hazard which would require a … vessel's Captain, Officers or crew to intervene in cargo operations." Keough Decl., Ex. J at 2. In sum, DeBiase has "not sustained [his] burden of illustrating sufficient facts warranting trial on this score." *Sinagra*, 182 F. Supp. 2d at 304.[10]

---

[9] DeBiase and his gang were responsible for terminating operations if a dangerous condition developed. The Agreement between NYCT and the defendants states:

> Prior to commencing, during and until the completion of its work, Contractor shall have the sole responsibility for inspecting and determining the safety of all work areas of all gear and equipment (whether supplied by Carrier, Contractor, or others) which will be utilized in its operations and Contractor shall not commence or shall immediately terminate its operations in the area involved until it has corrected or caused to be corrected any dangerous conditions and/or any unsafe gear and equipment which are known or should have been known to Contractor to exist or come into being during Contractor's operations.

Keough Decl., Ex. C (Section XI. Safety), at ¶ 3. Thus, if in DeBiase's judgment the obvious condition of the twist lock rendered it too dangerous, the responsibility for stopping work and reporting the dangerous condition lay with him.

[10] DeBiase's claim that defendants breached their duty to intervene because they failed to demonstrate that a "watchman or crew member remained with the vessel and was properly posted so as to fulfill this duty," Pl.'s Br. at 14, is without merit. The Vessel's log book and the Captain's testimony confirms that a duty officer, able seaman and ordinary seaman were all present on the Vessel. *See* Keough Reply Decl., Exs. N, O.

4.      *The Longshoring Safety and Health Regulations*

DeBiase alleges that defendants "violated 29 C.F.R. 1918.85 by failing to properly install, maintain and repair twistlocks and above deck cell guides on said vessel and in causing and permitting cones to be and remain on said vessel." Compl. ¶ 9. The Longshoring Safety and Health Regulations ("Regulations") apply only to employers and do not confer liability on owners, operators or agents of a vessel, unless such entities are acting as employers. *See Bradford v. BARGE B-10*, No. 98 Civ. 2991, 1999 WL 1256248, at *3 (S.D.N.Y. Dec. 27, 1999) (citing *Doca v Marina Mercante Nicaraguense, S.A*., 634 F.2d 30, 33 (2d Cir. 1980) (the duty of safety created by the Occupational Safety and Health Act of 1970 runs only from employer to employee). Under the Regulations, the term "employer" is defined as "a person that employs employees in longshoring operations or related employments." 29 C.F.R. § 1918.2. DeBiase does not allege that he was employed by anyone other than NYCT. Keough Decl., Ex. E ("DeBiase Dep.") at 20-21. Because defendants are not DeBiase's employers, the Regulations are not enforceable against them. Accordingly, this claim also fails.

## CONCLUSION

A cognizable negligence claim requires a showing that the defendants' alleged breach of duty proximately caused the plaintiff's injuries. Having failed to demonstrate that

there is a genuine issue of material fact as to whether defendants breached one of its *Scindia* duties, defendants' motion for summary judgment is granted.[11]  The Clerk is respectfully directed to close the case.

So ordered.

John Gleeson, U.S.D.J.

Dated:     September 25, 2009
           Brooklyn, New York

---

[11]     The record is not clear about exactly how the accident happened and a number of factual issues are unresolved: How high was the container raised? Was it raised multiple times? Who was communicating with the crane operator?  Did anyone tell Spitalieri to lower the container? Did the boat list or move?  Though factual disputes pertaining to the cause of DeBiase's injuries remain, there is no evidence in the record to suggest that any breach by defendants proximately caused the plaintiff's injury.